**BEFORE THE UNITED STATES JUDICIAL PANEL
ON MULTIDISTRICT LITIGATION**

| | |
|---|---|
| In re: AT&T INC. CUSTOMER DATA SECURITY BREACH LITIGATION | MDL Docket No. 3114 |

**MOVANT'S REPLY IN FURTHER SUPPORT OF MOTION FOR TRANSFER AND CENTRALIZATION OF RELATED ACTIONS TO THE NORTHERN DISTRICT OF TEXAS PURSUANT TO 28 U.S.C. § 1407 FOR CONSOLIDATED PRETRIAL PROCEEDINGS**

For the reasons set forth in Plaintiff Petroski's Motion for Transfer and Centralization of Related Actions to the Northern District of Texas, pursuant to 28 U.S.C. § 1407 for Coordinated or Consolidated Pretrial Proceedings (hereinafter, "Petroski Motion") and for the additional following reasons, Plaintiff submits that Section 1407 transfer to the Northern District of Texas is appropriate.

As a preliminary matter, none of the parties who filed responses to the Petroski Motion oppose centralization of the actions and thus there is no dispute that the purpose of Section 1407 will best be served by including these actions in centralized pretrial proceedings to secure the "just, speedy, and inexpensive determination" of the issues raised in the actions. The only issue is the most appropriate jurisdiction for the coordination of these actions. Unquestionably, that jurisdiction is the Northern District of Texas.

Since the initial filing of this MDL Petition, this potential MDL now consists of 46 actions filed in 8 different jurisdictions. The vast majority of those cases (33 of the 46) are pending in the Northern District of Texas. Of the remainder, 4 of the cases are pending in the Northern District of Georgia and the others are dispersed throughout different courts. While none of the other cases appear to have been consolidated, Judge Ada Brown has consolidated all of the Northern District of Texas cases in her court, and they are stayed pending the outcome of this MDL Petition.

1

I.  **The Northern District of Texas is Preferable as a Transferee Forum to the Northern District of Georgia or the Western District of Oklahoma**

As set forth in the Petroski Motion, and as supported by the majority of interested parties (12 of the 17 respondents) including Defendant (Dkt No. 66, 93), the Northern District of Texas is the most appropriate forum for this litigation. Many of the reasons supporting the transfer and consolidation of the related actions in the United States District Court for the Northern District of Texas have been set forth in the Petroski Motion (Dkt. No. 2) and the Interested Parties' responses filed in support thereof (Dkt. Nos. 57, 58, 62-66, 70, 74, 76, 78, 82, 88, 93) and will not be repeated in this reply. Rather, only those facts required to rebut the various statements in opposition (Dkt. Nos. 59, 71, 75, 77, 83) are included here.

a.  **AT&T's Security Operation and Breach Response are Texas-Based**

Defendant AT&T is headquartered in Dallas, Texas and, as AT&T has acknowledged, relevant witnesses and documents will be found there. Dkt. Nos. 66 at 2; 93 at 2-3. AT&T has disclosed that the data exfiltrated in the Data Breach "appears to be from 2019 or earlier, impacting approximately 7.6 million current AT&T account holders and approximately 65.4 million former account holders."[1] Given the likelihood that the Data Breach occurred before the 2024 release of the exfiltrated data on the dark web and given the seriousness of the Data Breach and the sheer volume of customer records at issue, it cannot be presumed that decisions about preventing, responding to, and/or disclosing the Data Breach were made at some low-level of the company as Unruh Plaintiffs speculate.

AT&T itself acknowledges that senior management's knowledge of, and response to, the Data Breach will likely be a critical aspect of the litigation. *See* Dkt. No. 66 at 7. AT&T further details that "AT&T's response to the security incident at issue is directed from AT&T's headquarters in Dallas, not Atlanta." Dkt. 93 at 2. AT&T's senior management is located in its Dallas headquarters, including AT&T's CEO, John Stanley and Chief Operating Officer, Jeff McElfresh, both of whom may be relevant witnesses in the litigation. Additionally, AT&T has

---

[1] https://about.att.com/story/2024/addressing-data-set-released-on-dark-web.html (last accessed April 30, 2024).

2

disclosed that its Chief Technology Officer and Chief Data Officer are employees of AT&T Services, Inc. and spend considerable time at AT&T's Dallas headquarters. *Id.* at 2. The people who work for and report to these executives are primarily based in Texas, as well. *Id.*

Thus, it appears that AT&T's cybersecurity efforts, including those related to this response to the breach at issue, are run out of the Company's Dallas headquarters. AT&T's Director of Cybersecurity, Mel Dale, operates the "Chief Security Office Identity and Access Management group" and "is responsible for the authentication, authorization, lifecycle management, and remote access product requirements and user experience for all of AT&T employees/vendors/contractors, consumers, business, and FirstNet users.[2] Ms. Dale maintains her office in AT&T's Dallas, Texas headquarters.[3] Similarly, Dan Solero, Assistant Vice President, Cybersecurity, oversees "AT&T's security governance, policy, [and] risk management" and also operates out of AT&T's Dallas, Texas headquarters.[4],[5]

### b. AT&T Employees Located in Atlanta Do Not Have Relevant Information[6]

The Unruh Plaintiffs posit that there may be relevant witnesses located in AT&T's Georgia offices, but this appears to be untrue. Dkt. No. 71 at 2-3, 7-11. Importantly, AT&T refutes the Unruh Plaintiffs' contentions that because a few cybersecurity employees were located in Atlanta, that relevant witnesses and documents are located there. AT&T notes of the dozen individuals Unruh Plaintiffs identified, *none* "were involved in the incident or the response to the incident" and 2 could not be identified as current or past employees at all. Dkt. 93 at 3.

Additionally, the Unruh Plaintiffs' assertion that the majority of the leaked data is "likely" to have come from AT&T Mobility customers is highly speculative and apparently incorrect. Dkt. No. 71 at 5-6. As AT&T notes, "the Georgia proponents' conjecture that AT&T Mobility customers

---

[2] https://secure-connections.att.com/main-panel, (last accessed April 30, 2024).
[3] https://www.linkedin.com/in/meldale, (last accessed April 30, 2024).
[4] https://secure-connections.att.com/main-panel, (last accessed April 30, 2024).
[5] https://www.linkedin.com/in/dan-solero-4608455, (last accessed April 30, 2024).
[6] The interested party response seeking transfer to the Western District of Oklahoma did not assert that there are witnesses or documentary evidence located in that jurisdiction. *See, e.g.,* Dkt. No. 59.

comprise the majority of potentially impacted individuals is *wrong*." Dkt. No. 93 at 1 (emphasis added).

Additionally, as of December 31, 2018, **less than one third** of AT&T's operating revenue came from wireless services, *i.e.,* AT&T mobility, further undercutting any implication that the majority of the exfiltrated data belongs to AT&T mobility customers, especially given that the data at issue in the Data Breach appears to be from 2019.[7] Further, AT&T notes that "[a]lthough AT&T's investigation remains ongoing, AT&T currently estimates that less than 5% of potentially impacted customer accounts are wireless." Dkt. No. 93 at 1. And even if more of the impacted customer accounts were related to AT&T Mobility, "it is merely part of AT&T, and AT&T's key leadership-including marketing, finance, sales and distribution, the organization that builds the wireless network, and customer operations, which has certain incident response and breach remediation responsibilities-are all located in Dallas, not Atlanta." *Id.* at 1-2.

### c.     The Case is Moving Expeditiously in the Northern District of Texas

Judge Ada Brown has already shown that she will move the case expeditiously and efficiently should the related actions be consolidated and transferred to her court. On April 17, 2024, a little more than two weeks after the initial action was filed in the Northern District of Texas, plaintiff Petroski filed a motion to consolidate the related actions pending in the Northern District of Texas. Petroski Dkt. No. 11. Judge Brown moved quickly, consolidating the related actions, as well as all later filed actions, on April 22, 2024. Petroski Dkt. No. 17. The various parties that have filed in the Northern District of Texas, under the oversight of Judge Brown, are moving the action along efficiently, further supporting transfer and consolidation in the Northern District of Texas.

---

[7] https://www.sec.gov/Archives/edgar/data/732717/000119312519045608/d705958d10k.htm#toc705958_2, at 9 (last accessed April 30, 2024).

### d. The Northern District of Texas Has the Availability, Resources, and Subject Matter Experience Necessary to Preside Over this Matter, If Centralized

If coordinated, these matters should be transferred to a judicial district "with a capacity and experience to steer [the] litigation on a prudent course." *In re: Janus Mut. Funds Inv. Litig.,* 310 F. Supp. 2d 1359, 1361-62 (J.P.M.L. 2004).

#### i. The Northern District of Texas v. Northern District of Georgia

Citing to statistical data from the U.S. Courts website, certain of the interested parties argue for centralization in the Northern District of Georgia due docket conditions. Close review of the same data, however, makes clear that the Northern District of Texas (the transfer location requested by Plaintiff Petroski and location preferred by the majority of interested parties) is an equally, if not more efficient forum in which to litigate these coordinated matters.

The United States District Court for the Northern District of Texas is not only home to several highly experienced and talented jurists, including the Honorable Ada Brown, before whom the instant Interested Parties have requested assignment of this matter, it is a very efficient docket. Overall, the number of pending matters on that docket decreased by 6.6% in 2023.[8] As of December 31, 2023, the Northern District of Texas had 3,307 private lawsuits pending (as differentiated from those filed by the United States), while there were 3,945 pending private actions in the Northern District of Georgia.[9] This suggests that the Northern District of Texas has an advantage over transfer to the Northern District of Georgia, which carries a higher volume of private actions. The vast majority of private cases filed in the Northern District of Texas (3,141/3,603 total cases disposed, or 87%) terminated before pretrial with a median interval of pendency of 7.0 months and 35 private actions terminated during trial.[10] Although the cases in the

---

[8] Table C—U.S. District Courts—Civil Statistical Tables for The Federal Judiciary (December 31, 2023) (available at: www.uscourts.gov/statistics-reports/statistical-tables-federal-judiciary-december-2023)(last accessed April 30, 2024).

[9] Table C-1—U.S. District Courts—Civil Statistical Tables for The Federal Judiciary (December 31, 2023) (available at: www.uscourts.gov/statistics/table/c-1/statistical-tables-federal-judiciary/2023/12/31)(last accessed April 30, 2024).

[10] Table C-5—U.S. District Courts—Civil Statistical Tables for The Federal Judiciary (December 31, 2023) (available at: www.uscourts.gov/statistics/table/c-5/statistical-tables-federal-judiciary/2023/12/31)(last accessed April 30, 2024). It should be noted that the Interested Parties opposing the motion and requesting transfer to the Northern District of Georgia have cited to a Table C-6, which cannot be located on the U.S. Courts website.

Northern District of Georgia that terminate before pretrial do so more quickly, with a median interval of pendency of 5.2 months, that figure represents (4,571/6,828 of the total cases, or 66%). Many cases there do not terminate until during or after pretrial (1,646/6,828 total case disposed, or 24%), with a median pendency interval of 11.5 months.[11] These statistics favor litigation in the Northern District of Texas, where an increased percentage of matters were disposed of at an earlier stage of litigation and in a relatively short period of time.

The overall number of civil trials taking place also favors transfer to the Northern District of Texas. There, 30 civil cases were tried overall, of which 20 were jury trials. There was an average median time interval to jury trial of 32.1 months.[12] Meanwhile, in the Northern District of Georgia, 45 civil cases were tried overall, of which 32 were jury trials. There was an average median time interval to jury trial of 33 months.[13] Matters requiring jury trial will reach that stage more quickly in the Northern District of Texas. In short, the Northern District of Texas, by the numbers, is the most favorable forum as a matter of docket management and efficiency.

###### ii.   Northern District of Texas v. Western District of Oklahoma

A review of the same statistical data published by the U.S. Courts website similarly shows that the Western District of Oklahoma is a no more efficient forum for this matter than is the Northern District of Texas. As of December 31, 2023, the Northern District of Texas had 3,890 total lawsuits pending, while there were 1,111 pending in the Western District of Oklahoma.[14] While at first blush, this may suggest that the Western District of Oklahoma has an advantage over transfer to the Northern District of Texas based solely on case volume, it is critical to look at case disposition rates. The vast majority of civil cases filed in the Northern District of Texas 3,141/3,603 total cases disposed (87%) terminated before pretrial with a median interval of pendency of 7.0

---

[11] *Id.*
[12] Table T-3—U.S. District Courts—Civil Statistical Tables for The Federal Judiciary (December 31, 2023) (available at: www.uscourts.gov/statistics/table/t-5/statistical-tables-federal-judiciary/2023/12/31)(last accessed April 30, 2024).
[13] *Id.*
[14] Table C-1—U.S. District Courts—Civil Statistical Tables for The Federal Judiciary (December 31, 2023) (available at: www.uscourts.gov/statistics/table/c-1/statistical-tables-federal-judiciary/2023/12/31)(last accessed April 30, 2024).

months and 35 actions terminated during trial with a median interval of pendency of 21.6 months.[15] In the Western District of Oklahoma, 336/912 (36.8%) cases terminated before pretrial with a median time interval of 9.4 months, 11 cases terminated during trial with a median pendency interval of 22.6 months.[16] These statistics strongly favor litigation in the Northern District of Texas, where a far greater proportion of cases are terminated at an earlier stage of litigation in a far shorter median period of time. The overall number of civil trials taking place also favors the Northern District of Texas. There, 30 civil cases were tried, of which 20 were jury trials. There was an average median time interval to jury trial of 32.1 months.[17] Meanwhile, in the Western District of Oklahoma, 8 civil cases were tried overall, of which 7 were jury trials. Due to the paucity of civil trials in the Western District of Oklahoma, the median time interval from filing to trial has not been calculated.[18] However, the available data shows that matters are disposed of by the courts in a shorter time period overall in the Northern District of Texas as compared to the in the Western District of Oklahoma.[19] In short, the Northern District of Texas, by the numbers, is a more favorable forum than is the Western District of Oklahoma as a matter of docket management and efficiency.

      e.      **The Northern District of Texas is Most Appropriate Due to Its Geographic Centrality and Easy Accessibility**

The Interested Parties requesting transfer in the Northern District of Georgia, or the Western District of Oklahoma argue, respectively, that such forums are ideal because they are both centrally located and easily accessible. The Northern District of Texas is at least equally, if not

---

[15] Table C-5—U.S. District Courts—Civil Statistical Tables for The Federal Judiciary (December 31, 2023) (available at: www.uscourts.gov/statistics/table/c-5/statistical-tables-federal-judiciary/2023/12/31)(last accessed April 30, 2024). It should be noted that the Interested Parties Unruh and Isbell in opposing the motion and requesting transfer to the Northern District of Georgia have cited to a Table C-6 (Doc. 71 at p. 12), which cannot be located on the U.S. Courts website.

[16] *Id.*

[17] Table T-3—U.S. District Courts—Civil Statistical Tables for The Federal Judiciary (December 31, 2023) (available at: www.uscourts.gov/statistics/table/t-5/statistical-tables-federal-judiciary/2023/12/31)(last accessed April 30, 2024).

[18] *Id.*

[19] Table C-5—U.S. District Courts—Civil Statistical Tables for The Federal Judiciary (December 31, 2023) (available at: www.uscourts.gov/statistics/table/c-5/statistical-tables-federal-judiciary/2023/12/31)(last accessed April 30, 2024).

more, accessible than the other proposed transferee locations; moreover, it is at least as centrally located, if not significantly more so than the other proposed locations.

Certainly, there can be no quarrel with the number of non-stop flights per day to Hartsfield-Jackson Airport in Atlanta; however, that fact provides no advantage to transferring this matter to the Northern District of Georgia over the Northern District of Texas. To start, the Interested Parties requesting transfer in the Northern District of Georgia argue that the number of direct flights between the two cities (Atlanta and Dallas) ensure no inconvenience for any party, witness, or counsel located in Dallas to travel to Atlanta. But the putative ease of travel between the two cities does not favor litigating in either city. While Hartsfield-Jackson Airport in Atlanta may be the busiest airport in the United States, Dallas has *two* very busy commercial airports, Dallas Fort Worth International Airport and Dallas Love Field Airport. Dallas Fort Worth Airport is the largest airline hub for American Airlines,[20] while Dallas Love Field is the birthplace and major operating base for Southwest Airlines.[21] With two commercial airports, each serving as a hub to a different airline, Dallas is an even more accessible destination by air to travelers from a wide variety of destinations, providing a slight advantage to transfer to the Northern District of Texas. Dallas is also accessible by Amtrak rail service,[22] making it at least as accessible as the Western District of Oklahoma.[23]

As a matter of geography, the Northern District of Texas, located in Dallas, Texas, is a far more desirable location for the transfer of this litigation. Dallas' centrality within the United States alone is enough to tip considerations away from the Northern District of Georgia. By way of example, Dallas is 1,543.02 miles road distance from New York City and is 1,441.44 miles road distance from Los Angeles. Whereas Atlanta is 868.3 road miles from New York City and 2,175 road miles from Los Angeles. This means that travel distance, including but not limited to flight times, will be more similar for witnesses, parties, and counsel regardless of whether they may be

---

[20] www.en.wikipedia.org/wiki/Dallas_Fort_Worth_International_Airport (last accessed April 30, 2024)
[21] www.en.wikipedia.org/wiki/Dallas_Love_Field (last accessed April 30, 2024).
[22] www.amtrakguide.com/stations/dalls-amtrak-station/ (last accessed April 30, 2024).
[23] With only one commercial airport located in Oklahoma City, which is not itself an airline hub, the Western District of Oklahoma is not as accessible by air as is Dallas, Texas.

traveling from the East Coast or the West Coast. Witnesses, parties, and counsel traveling from the Midwest may find that Dallas is at least as convenient to access for purposes of litigation as is Atlanta, with distance and travel time being the only considerations.[24]

Moreover, of the plaintiffs who have filed in or are seeking consolidation in the Northern District of Georgia, only one of them actually lives in that jurisdiction with the rest dispersed throughout the United States. Given the central location of Dallas, Texas, it is a more convenient location for all parties over Atlanta, Georgia.

**CONCLUSION**

For the reasons set forth herein, in the Petroski Motion, and in the various responses filed in support thereof, the Northern District of Texas is the appropriate transferee forum based on its connection to the litigation, the prevalence of witnesses and relevant evidence located in Dallas, Texas, its central location being of great convenience to the parties, and the number of cases pending in the Northern District of Texas, and the caseloads of the available judges.

Dated: May 2, 2024

Respectfully submitted,

*/s/James Pizzirusso*
James J. Pizzirusso
**HAUSFELD LLP**
888 16th Street, N.W., Suite 300
Washington, D.C. 20006
Tel.: (202) 540-7200
Fax: (202) 540-7201
Email: jpizzirusso@hausfeld.com

Steven M. Nathan
**HAUSFELD LLP**
33 Whitehall Street, Fourteenth Floor
New York, NY 10004
Tel.: (646) 357-1100
Fax: (212) 202-4322
Email: snathan@hausfeld.com

---

[24] Indeed, as the Interested Parties seeking transfer to the Western District of Oklahoma point out, Oklahoma City is a short drive from Dallas, Texas. This fact does not favor transfer to either Northern District of Texas or Western District of Oklahoma on balance of only those two jurisdictions, but does strongly favor transfer to the Northern District of Texas over the Northern District of Georgia.

Gary Klinger
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC**
227 W. Monroe Street, Suite 2100
Chicago, IL 60606
Tel.: 866-252-0878
Email: gklinger@milberg.com

Joe Kendall
**KENDALL LAW GROUP, PLLC**
3811 Turtle Creek, Suite 1450
Dallas, TX 75219
Tel.: (214) 744-3000
Fax: (877) 744-3728
Email: jkendall@kendalllawgroup.com

*Counsel for Plaintiff Alex Petroski*
*N.D. Tex. Case No. 3:24-cv-00757*